## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHELLE SPADE,                    :
                                   :
                   Plaintiff       :    No. 3:15-CV-0104
                                   :
            vs.                    :    (Judge Nealon)
                                   :                          **FILED**
                                   :                          **SCRANTON**
CAROLYN W. COLVIN, Acting          :
Commissioner of Social Security,   :                          MAR 2 1 2016
                                   :
                   Defendant       :                          Per_____
                                                              DEPUTY CLERK

## MEMORANDUM

On January 16, 2015, Plaintiff, Michelle S. Spade, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[2]  under

Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. §

1381 et seq, respectively.  (Doc. 1).  The parties have fully briefed the appeal.  For

the reasons set forth below, the decision of the Commissioner denying Plaintiff's

application for DIB and SSI will be vacated.

_____

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her application for DIB on January 17, 2012, and her application for SSI on January 27, 2012, alleging disability beginning on September 24, 2010, due to a herniated disc, sacrolitis, depression, ADHD, spinal stenosis, neuropathy, and cervical stenosis. (Tr. 17, 248).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on June 13, 2012. (Tr. 17).  On July 18, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 17).  An oral hearing was held on August 29, 2013, before administrative law judge William T. Vest, Jr., ("ALJ"), at which Plaintiff and an impartial vocational expert, Barbara Byers, ("VE"), testified.  (Tr. 27).  On September 11, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing limited sedentary work.  (Tr. 14-31).

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on March 27, 2015.  (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

On October 18, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On November 14, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on January 16, 2015. (Doc. 1). On March 27, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint on May 11, 2015. (Doc. 12). Defendant filed a brief in opposition on August 13, 2015. (Doc. 18). Plaintiff filed a reply brief on August 23, 2015. (Doc. 19).

Plaintiff was born in the United States on September 29, 1971, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 223). Plaintiff obtained her high school diploma, and can communicate in English. (Tr. 247, 249). Her employment records indicate that she previously worked as an assembly line worker, a bookkeeper, a certified nurse's assistant, a secretary, and a waitress. (Tr. 259). The records of the SSA reveal that Plaintiff had earnings in

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

the years 1987 through 2007, and 2009 through 2011. (Tr. 217). Her annual earnings range from a low of no earnings in 2008 to a high of seventeen thousand eight hundred eighty-seven dollars and fifty-five cents ($17,887.55) in 2001. (Tr. 217). Her total earnings during those twenty-four (24) years were two hundred seven thousand six hundred seventy-five dollars and eighteen cents. (Tr. 217).

In a document entitled "Function Report - Adult" filed with the SSA on February 18, 2012, Plaintiff indicated that she lived in a house. (Tr. 228). She indicated that she took care of her dog, took care of her personal needs like bathing and dressing, prepared her own meals, shopped for groceries, and performed household chores such as loading the dishwasher and doing the laundry. (Tr. 229-231). She was able to drive a car, but did not drive alone because her legs would go numb and "go out" on her. (Tr. 231). Before her illnesses, injuries, or conditions began, she was able to work two (2) to three (3) jobs and clean her house without any problems. (Tr. 229). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, concentration, understanding, following instructions, using hands, or getting along with others. (Tr. 233). She was able to walk fifty (50) feet before needing to rest for ten (10) to fifteen (15) minutes. (Tr. 233). She used a cane to walk, which was not prescribed by a doctor. (Tr. 234).

4

Regarding her concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, take medicine, or attend appointments. (Tr. 230, 232). She could count change, pay bills, handle a savings account and use a checkbook. (Tr. 231). She followed written or spoken instructions "ok," was not able to finish what she started, and did not handle stress or changes in routine well. (Tr. 233-234).

Socially, Plaintiff would talk on the phone, go to the store, and go to doctor's visits with others. (Tr. 232). Her hobbies included watching television and crafting. (Tr. 232). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 234).

Plaintiff filled out an "Activities of Daily Living" form on December 3, 2012, in which Plaintiff noted that she lived in an apartment with her son, was able to do the laundry, was unable to stand for long periods of time, would go grocery shopping and to doctor's appointments with assistance from others, was able to cook for herself and take care of her personal needs, watched television, listened to the radio, engaged in crafting, read, was able to handle money and bills without assistance, was able to drive forty (40) to fifty (50) miles a month, and visited her friends everyday. (Tr. 300-303).

At her hearing on August 29, 2013, Plaintiff testified that she was alleging

5

she was disabled due to a herniated disc, degenerative disc disease in her cervical

and lumbar areas, depression, anxiety, peripheral neuropathy, and bilateral carpel

tunnel syndrome. (Tr. 50-52). At the time of the hearing, Plaintiff was living in

apartment on the first floor of a her house with her son, and was renting the

remainder of her house out. (Tr. 51-53). She testified that she could hardly do

anything anymore, would spend her days watching television for a little bit and

reading, was able to microwave food, was unable to vacuum or sweep, was able to

drive short distances before her legs would become numb, no longer shopped for

food because she couldn't make it through the store, was able to walk one hundred

(100) feet at the most, could remain seated for twenty (20) minutes, could carry

five (5) pounds, and smoked daily. (Tr. 53-59).

   Plaintiff testified that she experienced sharp, shooting pain from her neck

down into her spine which caused bad muscle spasms in the mid-back area, and

had pain in her lower back into her left hip and leg. (Tr. 58, 64). The pain made it

uncomfortable for her to sit or to stand for more than about two (2) hours. (Tr. 66-

67). She rated her lower back and hip pain as a six (6) out of ten (10) and her neck

pain as a five (5) out of ten (10) after taking her medication. (Tr. 61-62).

Medications helped her pain, but she didn't "live a normal day anymore." (Tr.

58). Plaintiff used a cane, prescribed by Dr. Spangler, because of numbness in her

legs, difficulty walking, and difficulty getting up and down. (Tr. 60). Her sleep was "horrible" because she would wake up due to the pain "all the time." (Tr. 62). To relieve the pain, Plaintiff would lie on her left side on a heating pad. (Tr. 65). Plaintiff was taking Zoloft for her depression, and was being treated with Dilaudid, Trazadone, and Neurontin for back pain resulting from the degenerative disc disease, but they caused drowsiness. (Tr. 53-54, 63).

Plaintiff stated that she also had carpal tunnel syndrome. (Tr. 64). This made her hands cramp up when performing activities such as picking up an object, driving, talking on the phone, and gripping or grasping objects. (Tr. 64). She was not being treated for this impairment. (Tr. 64-65).

## MEDICAL RECORDS

By way of background, Plaintiff began complaining of low back pain after sustaining a contusion in 1995. (Tr. 364, 366, 378). An MRI of Plaintiff's lumbar spine was benign, but Plaintiff began taking OxyContin (Tr. 324, 378).

On August 6, 2007, Plaintiff underwent another MRI. (Tr. 335-336). Timothy Salvens, M.D. concluded it showed only "minimal" degenerative joint disease at one (1) level. (Tr. 335-336, 339). Plaintiff received a lumbar epidural steroid injection at L5-S1. (Tr. 384).

On December 29, 2007, Plaintiff visited the emergency room contending

7

that she had run out of pain medication, and she was given pain medication but not a prescription (Tr. 457-461).

On June 2, 2008, Isis Shabanky, M.D., discharged Plaintiff because she had misused her narcotic medication. (Tr. 494). Plaintiff was later investigated for forging a script, placed on probation, and received treatment for opioid dependence and abuse. (Tr. 500, 567, 588).

On November 18, 2008, Plaintiff began seeing Mahmood Nasir, M.D. (Tr. 552-54). Dr. Nasir ordered EMG/nerve conduction studies, which revealed bilateral carpal tunnel syndrome and "possible" L5 radiculopathy on the left side. (Tr. 554, 526-527, 559-560). Dr. Nasir provided Plaintiff with facet joint nerve blocks to alleviate Plaintiff's symptoms. (Tr. 544, 546, 548, 550, 637, 639, 641, 643-44, 714, 716, 718, 720).

On February 17, 2010, Plaintiff complained that she had developed right side radiating cervical pain while "releasing" her dog from a fight. (Tr. 543). Plaintiff's MRI revealed no focal disc herniation or significant disc bulging, and her EMG/NCS study revealed only bilateral carpal tunnel syndrome. (Tr. 555-56, 561).

On June 3, 2010, Plaintiff visited the emergency room complaining of chest congestion, cough, and chronic neck pain (Tr. 621-26, 778-83). Plaintiff's

musculoskeletal exam revealed normal range of motion and strength and no tenderness, and her neurological exam revealed no deficits (Tr. 625).

On September 1, 2010, Plaintiff had an appointment with Dr. Nasir, who injected her with a facet nerve block. (Tr. 637, 639, 641, 643-45). Dr. Nasir noted that Plaintiff had not obtained relief from previous conservative treatment. (Tr. 636, 638, 640, 642, 712, 717, 715, 719).

On September 4, 2010, Plaintiff was evaluated by Michael Murray, M.D. (Tr. 586-600). It was noted that Plaintiff had no cervical radiculopathy, minimal findings of carpal tunnel syndrome, and no significant radiculopathy in her lower extremities. (Tr. 590). Dr. Murray opined that Plaintiff could perform a wide range of sedentary work with no restrictions in handling, fingering, or reaching. (Tr. 595-596).

On December 7, 2010, Plaintiff was examined by Dr. Nasir, who noted that she had tender paravertebral areas at T6-T7 and T7-T8 levels bilaterally. (Tr. 642). Dr. Nasir performed thoracic paravertebral fact joint nerve blocks at T6-T7 and T7-T8 bilaterally. (Tr. 643).

On March 15, 2011, Plaintiff had an appointment with Dr. Nasir due to complaints of generalized pain and pain in her neck, thoracic region, and back. (Tr. 640). Plaintiff's examination revealed tender paravertebral areas at L2-L3 and

L3-L4 levels bilaterally, for which Plaintiff received lumbar paravertebral facet joint nerve blocks at L2-L3 and L3-L4 bilaterally.  (Tr. 640-641).

On July 7, 2011, Plaintiff underwent a pain management evaluation due to continued neck and back pain, with the worst pain being in her cervical region. (Tr. 638).   It was noted by Dr. Nasir that Plaintiff had tender paravertebral areas at C4-C5 and C5-C6 levels bilaterally, for which she received four cervical paravertebral facet joint nerve blocks. (Tr. 638-639).

On September 14, 2011, Dr. Nasir completed a Pennsylvania Department of Public Welfare Employability Assessment Form.  (Tr. 630).  He diagnosed Plaintiff with cervical and lumbar spondylosis, and opined that she was permanently disabled.  (Tr. 630).

On September 28, 2011, Plaintiff had a follow-up appointment with Dr. Nasir, and complained of chronic neck and back pain with intermittent flare-ups. (Tr. 636).  Plaintiff's examination revealed tender paravertebral areas at L4-L5 and L5-S1 levels bilaterally that worsened on extension and lateral movements.  (Tr. 636).  Dr. Nasir injected Plaintiff with four lumbar paravertebral facet joint nerve blocks at L4-L5 and L5-S1. (Tr. 636, 637)

On March 12, 2012, Dr. Nasir completed another medical source statement, opining that Plaintiff could: (1) lift ten (10) pounds occasionally; (2) stand and

walk for one (1) hour or less in an eight (8) hour day; (3) sit for less than six (6)

hours in an eight (8) hour day; (4) was limited in her ability to reach and handle.

(Tr. 648-649).

On March 21, 2012, Plaintiff began seeing Robin Spangler, M.D, for her

complaints of heartburn and anxiety, to name a few.  (Tr. 735-748).

On April 5, 2012, Plaintiff underwent a consultative examination performed

byThomas W. McLaughlin, M.D.  (Tr. 671).  Plaintiff complained of  noted her

left hip pain, back pain, leg pain, muscles spasms in her back, and pain, numbness,

and tingling in her left hand. (Tr. 671).  Activities that brought on the pain

included bending and lifting. (Tr. 672).  Precipitating factors were identified as

bending and lifting.  Plaintiff stated that physical therapy did not help her and

epidurals gave her short-term relief only. (Tr. 672).  Plaintiff's exam revealed she

ambulated with an antalgic gait favoring her left leg, needed assistance of the arms

of the chair to rise from the seated position, and needed assistance to rise from the

examination table. (Tr. 673).  Based on her medical history, Dr. McLaughlin

diagnosed Plaintiff with disc disease at the L4-L5 and L5-S1 levels, sacroiliitis on

the left,  and bilateral carpal tunnel syndrome by history.  (Tr. 676).  Dr.

McLaughlin opined that Plaintiff could: (1) lift and carry up to ten (10)

pounds frequently and twenty (20) pounds occasionally; (2) stand and walk up to

four (4) hours in an eight (8) hour day; and (3) sit for eight (8) hours with alternating sit/stand at her option.  (Tr. 678).

On April 19, 2012, Margel Guie, D.O., a state agency physician, opined that Plaintiff could: (1) occasionally lift and/ or carry up to twenty (20) pounds; (2) frequently lift and/ or carry up to ten (10) pounds; (3) stand and/ or walk for four (4) hours in an eight (8) hour workday; (4) sit for about six (6) hours in an eight (8) hour workday; (5) engage in unlimited pushing and/or pulling within the aforementioned weight restrictions; and (6) could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, and crawl.  (Tr. 119-120).  Dr. Guie also opined that Plaintiff should avoid even moderate exposure to cold, vibrations, and hazards including machinery and heights.  (Tr. 120).  He opined that Plaintiff could perform skilled, sedentary work within these aforementioned restrictions.  (Tr. 122).

On May 15, 2012, Plaintiff underwent a psychological consultative examination with Nicholas Brink, Ph.D.  (Tr. 685).  She reported that she suffered with anxiety and depression.  (Tr. 685).  Her symptoms were noted as irritability, frustration, and crying spells.  (Tr. 686).  It was noted that Plaintiff: (1) had a depressed mood and affect and limited insight, adequate remote and recent memory, good social understanding and skills, and usual productivity and

continuity of thinking; and (2) was hopeless, impatient, and irritable. (Tr. 687).

Dr. Brink diagnosed Plaintiff with major depression and intermittent explosive

disorder, and noted that her prognosis was poor. (Tr. 688). Dr. Brink also noted

that Spade's depression and back pain "greatly limit her activities of daily living."

(Tr. 688). Dr. Brink opined that Plaintiff had: (1) marked limitations in her ability

to carry out short, simple instructions and in her ability to make judgments on

simple work-related decisions; and (2) moderate limitations in her ability to

interact appropriately with the public, supervisors and co-workers, in her ability to

respond appropriately to work pressures in a usual work setting, and in her ability

to respond appropriately to changes in a routine work setting. (Tr. 688-689).

On May 16, 2012, Edward Zuckerman, Ph.D., a state agency psychological

consultant, opined that Plaintiff 's mental health impairments did not meet any

Impairment Listings because her symptoms were mild in the areas of activities of

daily living, maintaining social functioning, and maintaining concentration,

persistence, or pace. (Tr. 117).

On June 18, 2012, Plaintiff had an appointment with Dr. Nasir due to

complaints of radicular pain in her cervical and lumbar region involving her right

upper and left lower extremities. (Tr. 717).  She rated her pain a nine on the VAS

pain scale, and received lumbar paravertebral facet joint nerve blocks at L2-L3

and L3-L4 levels on the left side.  (Tr. 718).

On January 7, 2013, Plaintiff underwent a nerve conduction study, which showed bilateral carpal tunnel syndrome.  (Tr. 722).

On February 4, 2013, Plaintiff underwent a physical Residual Functional Capacity Assessment by Dr. Nasir.  (Tr. 695-699).  Dr. Nasir opined that, in a competitive work situation, Plaintiff: (1) could walk one (1) to two (2) city block without rest; (2) could sit and/ or stand for fifteen (15) to thirty (30) minutes at one time before needing to change positions; (3) could sit and/ or stand/ walk for less than two (2) hours in an eight (8) hour workday; (4) required shifting of positions at will; (5) would need unscheduled work breaks often for fifteen (15) minutes at a time; (6) could occasionally lift and/ or carry ten (10) pounds; (7) could rarely twist, climb ladders, or climb stairs; (8) could occasionally stoop, bend, crouch, or squat; (9) could grasp, turn, and/ or twist objects one hundred percent (100%) of the time bilaterally; (10) could perform fine finger manipulations ninety percent (90%) of the time bilaterally; (11) could reach using the arms seventy-five percent (75%) of the time bilaterally; (12) would be absent about three (3) days per month from work; and (13) needed to avoid humidity, dust, fumes, and wetness.  (Tr. 695-698).

On February 4, 2013, Dr. Nasir also completed a Lumbar Residual

14

Functional Capacity Questionnaire. (Tr. 700-704). Dr. Nasir opined the following: (1) Plaintiff's pain was occasionally severe enough to interfere with attention and concentration needed to perform even simple work tasks; (2) Plaintiff's lumbar spondylosis would be expected to last at least twelve (12) months; (3) Plaintiff was able to walk two (2) city blocks without rest or severe pain; (4) could sit and/ or stand for fifteen (15) to thirty (30) minutes at one time before needing to change positions; (5) could sit and/ or stand/ walk for less than two (2) hours in an eight (8) hour workday; (6) required shifting of positions at will; (7) would need unscheduled work breaks often for fifteen (15) minutes at a time; (8) could occasionally lift and/ or carry ten (10) pounds; (9) could rarely twist; (10) could grasp, turn, and/ or twist objects one hundred percent (100%) of the time bilaterally; (11) could perform fine finger manipulations ninety percent (90%) of the time with her right hand and twenty percent (20%) of the time with her left; (12) could reach using the arms seventy-five percent (75%) of the time bilaterally; (13) would be absent about three (3) days per month from work; and (14) needed to avoid humidity, dust, fumes, and wetness. (Tr. 700-703).

On February 4, 2013, Dr. Nasir also completed a cervical spine Residual Functional Capacity questionnaire. (Tr. 705-709). He diagnosed Plaintiff with cervical spondylosis and bilateral carpal tunnel syndrome with a fair prognosis.

(Tr. 705).  He noted that Plaintiff had chronic pain and parethesia, neck pain, hyperemic hands, decreased sensory modalities to the mid-forearm, and preserved reflexes in the upper extremities.  (Tr. 705).  Dr. Nasir noted the following as signs, findings, and associated symptoms of Plaintiff's impairments, including: muscle spasm and weakness; chronic fatigue; weight change; impaired sleep; lack of coordination; reflex changes; swelling; dropping things; and reduced grip strength.  (Tr. 705).  Dr. Nasir also noted that Plaintiff experienced three (3) to four (4) headaches per week with each lasting thirty (30) to sixty (60) minutes. (Tr. 706).  He opined the following: (1) Plaintiff's impairments could be expected to last for at least twelve (12) months; (2) Plaintiff's pain and or other symptoms would frequently interfere with Plaintiff's concentration and attention; (3) Plaintiff could tolerate moderate stress; (4) Plaintiff was able to walk two (2) city blocks without rest or severe pain; (5) could sit and/ or stand for fifteen (15) to thirty (30) minutes at one time before needing to change positions; (6) could sit and/ or stand/ walk for less than two (2) hours in an eight (8) hour workday; (7) required shifting of positions at will; (8) would need unscheduled work breaks often for fifteen (15) minutes at a time; (9) could occasionally lift and/ or carry ten (10) pounds; (10) could rarely twist, crouch, squat, or climb stairs; (11) could occasionally stoop and bend; (12) could grasp, turn, and/ or twist objects five percent (5%) of the time

bilaterally; (13) could perform fine finger manipulations five percent (5%) of the time bilaterally; (14) could reach using the arms five percent (5%) of the time bilaterally; (15) would be absent about three (3) days per month from work; and (16) needed to avoid humidity, dust, fumes, and wetness. (Tr. 707-709).

On March 4, 2013, Plaintiff had an appointment with Dr. Nasir, who noted that Plaintiff had tender paravertebral areas at C3-4 and C4-5 levels on the right side that worsened on extension and lateral movements. (Tr. 715). Dr. Nasir injected Plaintiff with paravertebral facet joint nerve blocks at C3-4 and C4-5 levels on the right side. (Tr. 716).

On April 29, 2013, Plaintiff had an appointment with Dr. Nasir due to complaints of pain in the back of her right leg extending into her upper thigh area with a pain rating of eight (8) on the VAS pain scale. (Tr. 712). Dr. Nasir noted Plaintiff had tender sacroiliac joints bilaterally, but more on the right side. (Tr. 712). The pelvic compression test, the sacral thrust test, and the distraction test were positive bilaterally. (Tr. 712). Dr. Nasirreferred to an MRI which showed minimal spinal stenosis and disc protrusions. (Tr. 712). Plaintiff received a sacroiliac joint injection on the right side. (Tr. 712). It was noted that Plaintiff responded well to therapeutic lumbar and cervical nerve blocks that resulted in eighty percent (80%) pain relief for three (3) months. (Tr. 712). It was also noted

17

that Plaintiff was able to take care of herself and function due to the combination of narcotic pain medication and the nerve blocks. (Tr. 712).

On May 24, 2013 and June 19, 2013, Plaintiff told Dr. Spangler that her pain improved due to medication. (Tr. 737, 739). On July 11, 2013, Plaintiff was directed by Dr. Spangler to decrease the Soma dosage if it caused excessive drowsiness. (Tr. 736).

On July 15, 2013, Dr. Nasir completed a physical residual functional capacity questionnaire. (Tr. 695). Dr. Nasir diagnosed Plaintiff with cervical spondylosis, lumbar spondylosis, and bilateral carpal tunnel syndrome. (Tr. 695). Her symptoms included pain, numbness in her hands, and fatigue. (Tr. 730). Dr. Nasir noted Plaintiff experienced ongoing pain, hyperemic hands, pain in lower extremities, and decreased sensory modalities to her knees and forearms bilaterally. (Tr. 730). Plaintiff also reported that her medications made her drowsy. (Tr. 730). Dr. Nasir opined that Plaintiff's pain and other symptoms were severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks. (Tr. 731). More specifically, Dr. Nasir opined that Plaintiff: (1) could sit and/ or stand for fifteen (15) to thirty (30) minutes at a time for less than two (2) hours in an eight (8) hour day; and (2) would need to take unscheduled breaks often during an eight (8) hour work day with a rest period

18

of about fifteen (15) minutes. (Tr. 731-732).

On July 15, 2013, Dr. Nasir also completed a cervical spine residual functional capacity questionnaire. (Tr. 725). Dr. Nasir diagnosed Plaintiff with cervical spondylosis and bilateral carpal tunnel syndrome. (Tr. 725). Plaintiff's symptoms were noted as muscle spasm, weakness, and tenderness; chronic fatigue; weight, sensory, and reflex changes; impaired sleep; lack of coordination; swelling; and reduced grip strength. (Tr. 725). Plaintiff's headaches included the symptoms of nausea/vomiting, an inability to concentrate, impaired sleep, exhaustion, visual disturbances, and mood changes. (Tr. 726). Plaintiff reported that her medications caused the side-effects of drowsiness, tiredness, and an inability to concentrate on tasks. (Tr. 726). Dr. Nasir also opined that: (1) Plaintiff's pain and other symptoms would frequently interfere with her attention and concentration; (2) Plaintiff could sit for less than two (2) hours and stand/walk for less than two (2) hours in an eight (8)hour working day; and (3) Plaintiff would likely be absent about three days per month as a result of the impairments or treatment. (Tr. 728-729).

On August 8, 2013, Plaintiff had an appointment with Dr. Spangler, at which she requested a can because her legs would give out. (Tr. 789). However, Dr. Spangler did not think a cane was necessary. (Tr. 787).

On August 9, 2013, Dr. Spangler completed a cervical spine residual functional capacity questionnaire. (Tr. 784-788). Dr. Spangler opined that Plaintiff: did not have reduced grip strength; did not drop things; had no restriction in movement of her cervical spine; did not have significant limitations with reaching, handling, or gripping; and did have tenderness. (Tr. 784-785).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

     Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence."  Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

     Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether

a specific job vacancy exists for him, or whether he would be
hired if he applied for work.  For purposes of the preceding
sentence (with respect to any individual), "work which exists in
the national economy" means work which exists in significant
numbers either in the region where such individual lives or in
several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  <u>Id.</u>; 20 C.F.R. §§ 404.1545 and 416.945;

<u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

<u>Poulos</u>, 474 F.3d at 92, <u>citing</u> <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of March 31,

2014.  (Tr. 20).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of September 24,

2010.  (Tr. 20).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "degenerative disc disease by history, depression, and anxiety (20 C.F.R. 404.1520(c) and 416.920(c))."  (Tr. 20).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 20-22).

At step four, the ALJ determined that Plaintiff had the RFC  to perform sedentary work with limitations.  (Tr. 22-30).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned

_____

7.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

finds that [Plaintiff] has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that [Plaintiff] should not engage in climbing, and she can perform only occasional stooping and crouching, but no crawling. She can perform no pushing/ pulling with the lower extremities, or perform overhead work. [Plaintiff] cannot work in an environment where she would be exposed to extreme temperatures. Additionally, [Plaintiff] is limited to performing simple, repetitive, non-production job tasks.

(Tr. 22).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 30).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between September 24, 2010, the alleged onset date, and the date of the ALJ's decision. (Tr. 31).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ erred in not finding Plaintiff's carpel tunnel syndrome to be a severe impairment; (2) substantial evidence does not support the ALJ's evaluation of the opinion evidence; (3) the Commissioner failed to sustain his burden of establishing that

there is other work in the national economy that Plaintiff could perform; and (4) the ALJ's credibility finding is not based on substantial evidence.  (Doc. 12, pp. 1-2, 12-29) .  Defendant disputes these contentions.  (Doc. 14).

### 1.   <u>Opinion Evidence</u>

Plaintiff argues that substantial evidence does not support the ALJ's evaluation of the opinion evidence.  (Doc. 12, pp. 16-20).  More specifically, Plaintiff argues that the ALJ erred in assigning to weight to the opinion of Dr. Nasir, Plaintiff's treating physician, because his opinion was supported by objective findings, the reports were completed solely by Dr. Nasir, and the ALJ had a duty to re-contact Dr. Nasir for clarification if he felt the physical Residual Functional Capacity Assessment Questionnaires completed by Dr. Nasir contained contradictory statements.  (Doc. 12, pp. 16-20).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  <u>See</u>, <u>e.g.</u>, <u>Morales v. Apfel</u>, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." <u>Morales</u>, 225 F.3d at 317; <u>Plummer</u>, 186 F.3d at 429; <u>see also</u> 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

27

and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Chandler v. Commissioner of Social Security, 667 F.3d 356, 361 (3d Cir. 2011) ("Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records . . . '[t]he law is clear . . . that the opinion of a treating physician does not bing the ALJ on the issue of functional capacity' . . . state agent opinions merit significant considerations as well.") (citing

28

Brown v. Astrue, 649, F.3d 193, 197 n.2 (3d Cir. 2011)); Baker v. Astrue, 2008

U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he

rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577

F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient

enough to permit the court to conduct a meaningful review." Burnett v. Comm'r

of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

In examining the record and the ALJ's RFC analysis, this Court finds that

the ALJ erred in failing to re-contact Dr. Nasir in order to clarify the

inconsistencies present throughout all of the physical residual functional capacity

questionnaires he completed.  In evaluating the opinion evidence, the ALJ stated

the following in relation to Dr. Nasir's opinion:

> On November 4, 201, Dr. Nasir completed an Employability
> Assessment Form and noted [Plaintiff] was temporarily
> disabled due to her cervical and lumbar spondylosis.  On
> September 14, 2011, Dr. Nasir completed a second
> Employability Assessment Form and noted [Plaintiff] was
> permanently disabled due to her cervical and lumbar
> spondylosis.
>
> On March 12, 2012, Dr. Nasir completed a Medical Source
> Statement of Ability to Do Work-Related Physical Activities,
> noting he last saw [Plaintiff] on September 28, 2011.  Dr. Nasir
> stated [Plaintiff] could occasionally lift 10 pounds; she could
> stand/ walk for 1 hour or less and sit for less than 6 hours in an

8-hour workday. [Plaintiff] was limited in pushing/ pulling in all extremities. She had the postural limitations of occasionally performing kneeling, bending, stooping, and crouching, and could never perform balancing or climbing. [Plaintiff] was limited in her ability to perform reaching and handling and had the environmental limitations of avoiding poor ventilation, vibration, temperature extremes, wetness, fumes, odors, gases, and humidity.

..................................................................................................

On February 4, 2013, Dr. Nasir completed a portion of a Physical Residual Functional Capacity Questionnaire, as it appears [Plaintiff] completed parts of the first page stating as to her medication, "drowsiness, can't drive when I take them," and other subjective complaints. It was noted she also had depression and anxiety affecting her physical condition. Her pain levels were severe enough to cause frequent interruptions of attention and concentration during a typical workday. She was noted as capable of performing low stress work, and was noted as able to walk 1-2 blocks, sit for up to 15 to 30 minutes, and stand for 15 to 30 minutes. During an 8-hour workday, she could sit and stand/ walk for a total of less than 2 hours each.

It was noted in the Questionnaire, either by [Plaintiff] or Dr. Nasir, that she would need to get up and walk around for 15 minutes every 15 minutes, and she would need the option to change positions at will. [Plaintiff] would be occasionally able to lift up to 10 pounds. She was limited to looking down, stooping, and crouching occasionally, and she could perform twisting and climbing ladders/ stairs rarely. She could use her hands in grasping/ turning/ twisting for up to 100% of the workday, could perform fine manipulation up to 90% of the workday, and could performing reaching for up to 75% of the workday. [Plaintiff] would need to avoid work environments involving humidity, dust, fumes, and wetness.

A Cervical Spine Residual Functional Capacity Questionnaire

was also completed by Dr. Nasir on February 4, 2013. He
stated [Plaintiff] had cervical spondylosis and bilateral CTS
with a fair prognosis, and multiple symptoms, all of weight,
which did not cause a limitation in motion or headaches.
However, headaches are later referenced as occurring 3-4 times
a week. Dr. Nasir stated [Plaintiff] was limited to using her
bilateral upper extremities in grasping/ turning/ twisting/ fine
manipulation/ reaching for no more than up to 5% of the
workday, despite his statement, on that same date, that she
could perform same for 100%, 90%, and 75%, respectively.
The undersigned notes no explanation was provided to explain
the inconsistency in [Plaintiff's] ability to manipulate objects,
which detracts from Dr. Nasir's credibility. A second Cervical
Spine Residual Functional Capacity Questionnaire was
completed by Dr. Nasir on July 15, 2013 with essentially the
same content as Exhibit B36F.

Dr. Nasir completed a third questionnaire on February 4, 2013,
addressing [Plaintiff's] lumbar spine. He noted the presence of
a positive straight leg raising test on the left, a bilateral positive
Lasegue's sign, lumbar spondylosis, and the presence of low
back pain radiating into the left side of [Plaintiff's] body. Her
lumbar pain would occasionally interrupt [her] attention and
concentration when performing simple work tasks, and her
limitations were largely the same as referenced above in the
other questionnaires. However, her ability to perform grasping,
twisting, and turning objects was noted to be up to 100% of the
workday, she could perform fine manipulation for up to 90%
on the right and 20% on the left, and reaching up to 75% of the
workday. The undersigned notes [Plaintiff's] ability to perform
fine manipulation was noted as equal bilaterally, though
varying in the extent of ability, in Dr. Nasir's other
questionnaires.

Dr. Nasir completed another Physical Residual Functional
Capacity Questionnaire on July 15, 2013, and noted [Plaintiff]
had a bulging disc, neck pain, numbness in the hands, and

31

fatigue due to the condition of her lumbar spine at L4-5 and L5-S1. Her cervical spine was noted as having spurs, constant pain, and caused neuropathy in the left hip due to the condition of the spine at C4-5 and C5-6. Dr. Nasir stated [Plaintiff's] treatment included medication and paravertebral facet joint nerve blocks; and the undersigned notes the continued absence of any back surgery. Dr. Nasir noted she had depression, and that her impairments had lasted/ would last at least 12 months in duration. Her work related restrictions were largely the same as noted in the questionnaire of February 4, 2013, above. The undersigned gives no particular weight to Dr. Nasir's opinions contained in the Questionnaires as they are not supported by the objective medical evidence; additionally, parts of same appear to be completed by [Plaintiff], and the questionnaire responses contain contradicting statements.

(Tr. 26-28).

Thus, the contradiction in Dr. Nasir's opinions revolves around the percentage per workday that Plaintiff could engage in grasping, twisting, turning, performing fine manipulation, and reaching. (Tr. 26-28). In the first opinion rendered in the Medical Source Statement on March 12, 2012, Dr. Nasir opined that Plaintiff was "limited in her ability to perform reaching and handling." (Tr. 648-649). In a second opinion rendered by Dr. Nasir on February 4, 2013 in a lumbar RFC questionnaire, Dr. Nasir opined that Plaintiff's ability to bilaterally grasp, twist, and/ or turn objects was up to one hundred percent (100%) per workday, to perform fine manipulation was up to ninety percent (90%) on the right and twenty percent (20%) on the left per workday, and to bilaterally reach was up

to seventy-five (75%) of the workday. (Tr. 700-703). In a third opinion rendered in a cervical RFC assessment by Dr. Nasir on February 4, 2013, Dr. Nasir opined that Plaintiff had significant limitations in reaching and handling, and was limited bilaterally in grasping, turning, twisting, fine manipulation, and/ or reaching for no more than up to five percent (5%) of the workday. (Tr. 705-709). However, on that very same day as the aforementioned opinions rendered on February 4, 2013, Dr. Nasir opined in a physical RFC assessment that Plaintiff could: (1) grasp, turn, and/ or twist objects one hundred percent (100%) of the time bilaterally; (2) could perform fine finger manipulations ninety percent (90%) of the time bilaterally; and (3) could reach using the arms seventy-five percent (75%) of the time bilaterally. (Tr. 695-698). Therefore, there is a discrepancy among four (4) opinions as to exactly what percentage of a workday Plaintiff could grasp, turn, twist, perform fine manipulation, and/ or reach.

According to Social Security Regulation ("SSR") 96-5p,

> For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

SSR 96-5p, 1996 SSR LEXIS 2. It is acknowledged that this re-contact provision has recently been made to be permissive, rather than mandatory, as codified in 20

33

C.F.R. § 404.1520b(b). It is also acknowledged that the United States District

Court for the Middle District of Pennsylvania has recently stated the following:

> . . . [I]f any of the evidence, including medical opinions, is
> inconsistent, the adjudicator will weigh the relevant evidence
> and see whether he or she can determine whether the claimant
> is disabled based on the evidence of record. 20 C.F.R.
> 404.1520b(b). Thus, inconsistency alone is insufficient to
> trigger the ALJ's obligation to take the action under 20 C.F.R.
> 404.1520 b(c). Rather, an ALJ is obligated to take action to
> resolve an evidentiary inconsistency only if, after weighing the
> evidence, the ALJ cannot reach a conclusion as to whether the
> claimant is disabled.

Ross v. Colvin, 2015 U.S. Dist. LEXIS 45846 (M.D. Pa. Mar. 10, 2015) (Rambo,

J.).

However, in the case at hand, given the fact that treating physician Dr. Nasir

gave four (4) separate, differing opinions regarding Plaintiff's ability to grasp,

twist, turn, perform fine manipulation, and reach, with three (3) of these opinion

being rendered on the same day, this Court would be remiss to uphold the ALJ's

decision that completely discredits a treating physician's opinions that contained

important inconsistencies on issues reserved to the Commissioner that could affect

the disability determination, and the bases for which are completely unclear. This

court finds it hard to believe that it was possible for the ALJ, who admitted that

these opinions were contradictory, to weigh the inconsistent evidence, namely the

four (4) aforementioned inconsistencies in the opinions of Dr. Nasir, and resolve this evidentiary inconsistency without re-contacting the Dr. Nasir to clarify what he believed Plaintiff's limitations were in grasping, twisting, turning, performing fine manipulation, and reaching.  Furthermore, the ALJ's RFC determination contained no limitations whatsoever regarding grasping, twisting, turning, performing fine manipulation, or the like, and thus cannot be said to be excusable under the harmless error doctrine.  As such, substantial evidence does not support the weight the ALJ accorded to Dr. Nasir's opinion, remand is warranted at this juncture, and as a result, Plaintiff's remaining assertions will not be addressed.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: March 21, 2016

/s/ **William J. Nealon**
**United States District Judge**